UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.                              CASE No. 8:08-CV-1409-T-27TGW

AEROKINETIC ENERGY
CORPORATION, et al.,

        Defendants.

_____

REPORT AND RECOMMENDATION

      The Securities and Exchange Commission ("SEC") filed a

complaint against the defendants Aerokinetic Energy Corporation

("Aerokinetic" or "AEC") and Randolph E. Bridwell for defrauding investors

in violation of the federal securities laws (Doc. 1). Both defendants

consented to the entry of judgments that permanently enjoined them from

violating Sections 5 and 17(a) of the Securities Act of 1993, 15 U.S.C. 77e,

77q(a), and Section 10(b) of the Securities Exchange Act, 15 U.S.C. 78j(b),

as well as Rule 10b-5, in connection with the fraudulent sale of unregistered

stock in Aerokinetic. The injunctions also provided for a court-ordered determination of disgorgement, prejudgment interest, and civil penalties in the event the parties could not agree on an award of damages (Docs. 48, 49). The consent judgments provided that the allegations in the complaint are taken as true for purposes of a motion on those matters (Doc. 48, p. 4; Doc. 49, p. 4). Based upon the conceded allegations, I recommend that the defendants, jointly and severally, disgorge ill-gotten gains of $555,000, with prejudgment interest from July 23, 2008, at the interest rate used by the Internal Revenue Service under 26 U.S.C. 6621(a)(2), and that a civil penalty be assessed against Aerokinetic in the amount of $250,000, and against Bridwell in the amount of $130,000.

I.

The complaint alleges that, since September 2006, the defendants, Aerokinetic and Bridwell, raised over $500,000 by selling securities in the form of Aerokinetic common stock (Doc. 1, ¶ 2). It alleges further that, in violation of the Securities Act, the securities were not registered with the SEC or exempt from registration (id., ¶ 6).

More significantly, the complaint detailed a fraudulent scheme to sell the unregistered securities. In essence, the defendants falsely represented to investors that they had developed patented energy technology that would generate electrical energy at a fraction of the cost of conventional or nuclear means with no residual pollution (id., ¶ 11). Two products were purportedly marketed in connection with the scheme: an "indoor windmill" that could produce large amounts of energy from non-moving air (the Leonardo), and an electric car (the Raphael) that had purportedly undergone successful test runs (id., ¶¶ 12, 14). Neither product, however, had advanced past the early states of development.

The indoor windmill, which was first constructed from a swing set bought off e-Bay to which magnets were attached, was represented to be capable of harvesting energy from non-moving air and producing power 24 hours a day, 365 days a year, at a fraction of the cost of a conventional or nuclear power plant without pollution (id., ¶¶ 24, 30). The company stated that it had an opportunity to control a growing portion of the $4.5 trillion spent annually worldwide on energy production (id., ¶ 26). Thus, its business plans projected sales in 2009 of $100 million, and, by 2013, sales of more

than $12 billion (id., ¶ 45).   In support of these claims, Bridwell has represented that the company has numerous standing orders and contracts for the Leonardo.   However, the complaint alleges that "Aerokinetic has no suppliers, no market share, no full-time employees, no technicians, no customers, no demand for services, and no sales" (id., ¶ 46).

Misrepresentations were also made concerning the electric car (the Raphael).   Investors were told that it has undergone several successful test runs, and that Lee Iacocca, Brad Pitt, Arnold Schwarzenegger, and Al Gore had shown an interest in it  (id., ¶ 37).   However, the electric car was alleged to be "merely an idea that has not even been developed" (id.,  ¶ 31). Bridwell also misrepresented to investors that the company would enter into agreements with GM and Ford  (id., ¶ 37).

The complaint alleges other false statements.   The complaint alleges that it was misrepresented that the company holds patents for the Leonardo and the electric car (id., ¶¶ 32, 33).   It also states that the company misrepresents that it has offices in New Orleans and Seattle (id., ¶¶ 41, 42). Further, the company misrepresents that it has a board of directors and the

presence of executives besides Bridwell and a lawyer, who is said to be general counsel (id.).

The complaint also alleges that Bridwell has used investor funds for personal expenses (id., ¶ 47). Those expenses include the purchase of a new car for his daughter (id., ¶ 48).

Approximately twenty individuals were induced into purchasing Aerokinetic common stock in amounts between $10,000 and $100,000 (see Doc. 54-1). The amounts invested totaled $555,000 (id.).

The SEC has filed a motion seeking disgorgement with prejudgment interest and the imposition of civil penalties against the defendants (Doc. 54). The SEC requests the defendants be held jointly and severally liable for disgorgement in the amount of $555,000, plus prejudgment interest (id.). In addition, it seeks civil penalties of $500,000 against Aerokinetic, and $130,000 against Bridwell (id.).

The defendants have filed a response opposing any disgorgement or civil penalties (Doc. 59). They assert that "the passage of time since the filing of the SEC complaint has established that representations made by AEC and Bridwell to investors were and are materially accurate" (id., p. 2). The

defendants also assert that the investors do not want the imposition of the requested remedies (id., pp. 8-9).

The SEC's motion has been referred to me for a report and recommendation (Doc. 63). A hearing was subsequently held on the motion (Doc. 71).

II.

The consent judgments set out criteria under which disgorgement and civil penalties are to be assessed. Thus, the judgments provide (Doc. 48, p. 4; Doc. 49, p. 4):

> In connection with the Commission's motion for disgorgement and/or a civil penalty, and at any hearing held on such a motion: (a) [the defendants] will be precluded from arguing that [they] did not violate the federal securities laws as alleged in the complaint; (b) [the defendants] may not challenge the validity of the Consent or this Judgment; (c) solely for the purposes of such motion, the allegations of the complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure.

The defendants' response does not accept these restrictions. In particular, the defendants do not accept the allegations, but assert that subsequent developments have shown the facts to be different than the allegations. They contend that an award of disgorgement is inequitable because the SEC "failed to establish that the alleged misrepresentations in the SEC complaint are true" (Doc. 59, p. 9). The SEC, however, had no such obligation; the defendants conceded that the allegations were true. The defendants, of course, could have gone to trial and made the SEC prove their allegations, as is being done in the related case of Securities and Exchange Commission v. Nodurft, Case No. 8:09-CV-866-T-26AEP. The defendants' suggestion that this was an adhesion situation (Doc. 59, p. 6 n.5) is not only unsupported by any facts or law, but is frivolous on its face. Consequently, the defendants, having foregone the opportunity to go to trial, are bound by the stipulations they made in settling this case.

The Supreme Court has recently confirmed the principle that parties are not permitted to deny the truth of stipulated facts. Christian Legal Soc. Chapter of the University of California, Hastings College of the Law v. Martinez, ___ U.S. ___, ___, 130 S.Ct. 2971, 2983 (2010)("factual

stipulations are formal concessions ... that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact"). Accordingly, the issues of disgorgement and civil penalties are to be decided based upon the facts alleged in the complaint in light of the defendants' stipulation that they are true.

      A. <u>Disgorgement</u>.

      The plaintiff seeks an order requiring defendants Aerokinetic and Bridwell to pay, jointly and severally, disgorgement in the amount of $555,000 (Doc. 54). The pertinent portion of each consent judgment states that the defendants "shall pay disgorgement of ill-gotten gains, [with] prejudgment interest thereon" (Doc. 48, p. 4; Doc. 49, p. 4).

      The remedy of disgorgement is not designed to punish, but rather, is intended to "deprive the wrongdoer of his ill-gotten gain" and to deter others from violating the securities laws. <u>Securities and Exchange Commission</u> v. <u>Blatt</u>, 583 F.2d 1325, 1335 (5th Cir. 1978). Moreover, the disgorgement amount set by the courts need only be a reasonable approximation of the ill-gotten gains. <u>Securities and Exchange Commission</u> v. <u>Calvo</u>, 378 F.3d 1211, 1217 (11th Cir. 2004)("The SEC is entitled to

disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains").

The fact that there were ill-gotten gains is established by the allegations in the complaint, which the defendants agreed were true. The amount of those gains was shown by the Declaration of Fernando Torres, an accountant with the SEC (Doc. 54-1). Aerokinetic's Bank of America account received "a total of $575,200 in funds from about 20 persons ... representing about 97% of total deposits" (id., ¶ 5). The declaration identified the individuals providing the deposited funds and the amounts each had provided (id.). Torres accepted the statement that two of the individuals had made loans and had not received a security, so that the amount of the total deposits should be reduced by the amounts they had furnished, which was $20,200 (id., p. 2). Accordingly, Torres concluded that the total amount invested was $555,000 (id.).

At the hearing, the defendants suggested that the amount should be about $538,000 (Doc. 71, p. 28). However, defense counsel stated he was "not even going to complain about it" (id.). Consequently, any challenge to the SEC's showing of $555,000 in ill-gotten gains is properly deemed

-9-

waived.   In any event, the defendants have not produced any evidence supporting a lesser amount.

However, the defendants assert that the court, in calculating the disgorgement award, should offset Aerokinetic's business expenses, which they indicate are in the amount of $538,518.49 (Doc. 59, p. 11, Ex. G). Although the law is not settled on this point, a securities violator faced with disgorgement can, at most, deduct expenses incurred in a partially legitimate business.   Securities and Exchange Commission v. Wallenbrock, 440 F.3d 1109, 1114 (9th Cir. 2006).   However, this is not a case where the defendants operated a partially legitimate business.   The scheme alleged in the complaint was entirely fraudulent.

Like the defendants in   Securities and Exchange Commission v. Wallenbrock, supra, 440 F.3d at 1115, Aerokinetic existed "simply to obtain investors' money under false pretenses, money the defendants spent at their sole discretion, unrelated to the investors' expectations of the purposes, risks and rewards of entrusting the defendants with their investment dollars."   Id. "It follows that it would be unjust to permit the defendants to offset against the investor dollars they received the expenses of running the very business

-10-

they created to defraud those investors into giving the defendants the money in the first place." Id. at 1114. Business and operating expenses are therefore not an appropriate or legitimate deduction because, under the circumstances of this case, any offset would be for the benefit of an entirely illegitimate operation.

Even if an offset of expenses were appropriate, the defendants have failed to substantiate the alleged expenses. All that the defendants have produced is a conclusory one-page spreadsheet purporting to identify expenses in the amount of $538,518.49 (Doc. 59-7, p. 2). The spreadsheet is unsworn and unexplained. Moreover, it is not accompanied by any backup documentation. Therefore, even if an offset of expenses would be appropriate in this case – and it is not – the defendants have not adequately established their expenses. Consequently, there is no basis for an offset to a disgorgement award of $555,000.

The defendants seek to forestall disgorgement, as well as civil penalties, on the ground that the investors do not wish the imposition of those remedies since that could cause the venture to fail. In support of the contention, the defendants have submitted declarations purportedly from each

-11-

of the eighteen investors (see Doc. 59, p. 9 n.7). For several reasons, this contention is unpersuasive.

The defendants assert, based upon the shareholder declarations, that "[a] very large majority of AEC shareholders are quite comfortable with the investment decision they have made in purchasing common stock from AEC and Bridwell" (id., p. 8). This assertion is misleading. Thus, while the current shareholders may be comfortable with their investment decision, twelve of the eighteen were not among the investors identified in the Torres declaration.[1]   On the other hand, nine or ten of the investors identified by Torres did not provide any declaration that they were comfortable with their investment.[2]   Significantly, the amount of investments from the initial investors would total at least $310,000, and would be $335,000 if the

---

[1]Those shareholders are Robyn Lederman, Mindy Krigel Swartz, Jay C. Hitchcock, Amar Latif, Nouri K. Latif, Daniel W. Nodurft, Calvin Mackey, Anthony J. Bordlee, Elizabeth Okon, George Okon, and Marcus Jackson (see Doc. 59, Ex. B). Nodurft and Jackson are associated with Aerokinetic and may not even be investors (see Doc. 59-5. p. 2 (Jackson)). but may have received their shares due to their association. The same may be true of other current shareholders (see Doc. 59, p. 10).

[2]Those investors are Damien Bonnetete, Roosevelt L. Davis, Barbara Batinkoff. Sarl Apolo, Justin Jacobs, Reid Enterprise Inc., State Farm Federal Credit Union, Steven Braman, Gitlin Cardiology, and Richard Weidman. I am assuming that State Farm Federal Credit Union was not an investor, but simply provided a monetary instrument to the investor. Since the investor is not identified, it is unknown whether he or she provided a declaration.

individual who obtained the funds from the State Farm Federal Credit Union
is not a declarant. Under the circumstances, there is no reason to think that
these individuals are comfortable with their investment.

Furthermore, with respect to the eight initial investors identified
by Torres who did provide declarations, their declarations are clearly suspect
and not deserving of any meaningful weight. In the first place, they were not
prepared by the individuals, since they all contain identical language.
Moreover, the presence of an uncorrected error and omission indicates that
the declarations were not closely read by the declarants. Thus, the date does
not include the year and only one individual (Aaron J. Jade) wrote that in (id.,
Ex. B, p. 12). Further, in the last sentence of paragraph 6, the word
"material" should be "materially," but no one made that correction.

Even more significant, the declarations state "the SEC is seeking
large sums of money from AEC and Bridwell as disgorgement, prejudgment
interest and monetary penalties for possible inadvertent violations of the
securities laws" (id., Ex. B). This is a blatant misrepresentation of the
allegations in the complaint that the defendants accepted as true. There was
nothing "possible" about these violations, and they certainly were not

-13-

"inadvertent." Under these circumstances, the declarations should be discounted substantially.

Moreover, the allegations of the complaint show that Bridwell was untruthful in soliciting the investments. No evidence has been presented indicating that his approach has changed. Thus, from all that appears, the declarations were obtained based upon misleading information. Indeed, as indicated, that is shown by the language of the declarations.

Consequently, the declarations do not provide a valid basis for denying disgorgement (or the imposition of civil penalties).

The SEC agreed that, if an investor received some funds from the disgorgement, he or she could reinvest those funds with Aerokinetic (Doc. 71, pp. 15-16). However, it was equivocal whether, in this case, any disgorged funds would go to the investors or would simply go to the Treasury, depending upon the amount recovered and the expense of reimbursement (id., p. 18). Under the circumstances, the SEC should be required to reimburse the investors identified by Torres from any amount that is disgorged. Here, there are a small number of investors, and they have been identified in the Torres declaration. Consequently, there should be no meaningful expense in

-14-

returning funds to them.   Accordingly, I recommend that any award of disgorgement be conditioned on the SEC returning a pro rata share to those investors.

The defendants do not contest the imposition of joint and several liability.   Moreover, the SEC has cited to authority to show that defendants may be held jointly and severally liable where they share a close relationship and a joint benefit (Doc. 54, p. 11).   See Securities and Exchange Commission v. Wallenbrock, supra.   Bridwell served as Aerokinetic's founder, President, and Chief Technology Officer (Doc. 1, ¶ 2).   He had access to Aerokinetic's bank account and misappropriated funds to his personal account (id., ¶¶ 47, 48).   Therefore, a judgment ordering disgorgement to be paid by the defendants jointly and severally is appropriate.

B.  Prejudgment Interest.

The plaintiff also seeks an award of prejudgment interest on the amount of disgorgement at the interest rate that the IRS uses to determine interest due on underpaid taxes (Doc. 54, p. 10).   A district court has discretion to award prejudgment interest to a prevailing litigant.   Securities and Exchange Commission v. Carrillo, 325 F.3d 1268, 1273 (11th Cir. 2003);

Securities and Exchange Commission v. First Jersey Securities, Inc., 101 F.3d 1450, 1476-77 (2nd Cir. 1996), cert. denied, 522 U.S. 812 (1997).

An award of prejudgment interest serves the important function of compensating the victims for the time they did not have use of their money because of the defendants' unlawful actions. Securities and Exchange Commission v. First Jersey Securities, Inc., supra. It also insures that the wrongdoers do not receive what would otherwise be an interest-free loan. See id. at 1477.

It does not appear that the defendants are challenging the award of prejudgment interest (see Doc. 59, p. 12). If they are, their challenges are limited to the same reasons that were found unpersuasive with respect to disgorgement. In all events, any challenge would be foreclosed by each defendant's agreement that "prejudgment interest shall be calculated from July 23, 2008" (Doc. 47-1, p. 2; Doc. 47-2, p. 2). Furthermore, the judgments provide that prejudgment interest shall be "based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. §6621(a)(2)" (Doc. 48, p. 4; Doc. 49, p. 4).

The problem here is that, as the SEC stated, the interest rate is "a moving target" since it changes periodically (Doc. 71, p. 6). The SEC has only calculated interest on the $555,000 disgorgement amount through February 28, 2010, a calculation which totals $41,496.64 (Doc. 54-2). Thus, not only has the prejudgment interest amount not been fully determined, but, as the SEC acknowledged, the computation is sufficiently complicated that the SEC relies on its accountants to make the calculation (Doc. 71, pp. 49-50). Under these circumstances, the court should not be expected to struggle with the determination of the amount of prejudgment interest. Accordingly, as to that amount, I recommend that the court enter an order setting the disgorgement amount, and direct the SEC (or both parties) to provide immediately the amount of prejudgment interest, so that judgment can be entered.

C. Civil Penalties.

The consent judgments provide that each defendant "shall pay ... a civil penalty pursuant to 20(d) of the Securities Act, 15 U.S.C. §77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §78(u)(d)(3)" (Doc. 48, p. 4; Doc. 49, p. 4). The SEC requests civil monetary penalties of $500,000

-17-

against Aerokinetic, and $130,000 against Bridwell, for their securities law violations under those sections.  Civil penalties are designed to punish the wrongdoer and to deter future violations.  <u>Securities and Exchange Commission</u> v. <u>Moran</u>, 944 F. Supp. 286, 296 (S.D. N.Y. 1996).  They are to be determined "in light of the facts and circumstances" of each case.  15 U.S.C. 77t(d)(2)(A); 15 U.S.C. 78u(d)(3)(B)(i).

Civil penalties are divided into a three-tier structure in both the Securities Act and the Securities Exchange Act, with the penalties being capped by the greater of a specified statutory amount, or the gross amount of pecuniary gain to the defendant.  15 U.S.C. 77t(d)(2), 78u(d)(3).  The three tiers have increasing maximum statutory caps.  The first tier applies simply to statutory violations.  The second tier requires a violation involving fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

The penalty sought by the plaintiff falls in the third tier, which, as adjusted for inflation, allows for a penalty not to exceed the greater of $130,000 per violation by a natural person, or $650,000 for any other person,

or the gross amount of pecuniary gain to such defendants as a result of the violation. See 17 C.F.R. Pt. 201, Subpt. E, Tbl. III. This tier applies, if:

> (1) the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

> (2) the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

15 U.S.C. 77t(d)(2)(C), 78u(d)(3)(B)(iii).

As the SEC contends, the third-tier penalties clearly are applicable. Thus, the complaint, taken as true, alleges that the defendants "made ... numerous material misrepresentations and omissions regarding Aerokinetic's operations, technology, products, financial forecasts, and use of investor funds" (Doc. 1, ¶ 22). Consequently, the violations involve fraud and deceit.

Moreover, the fraud resulted in substantial losses. The SEC, through the Torres declaration, has shown losses of more than $500,000. While the defendants suggest that the statutes do not define the term "substantial loss" (Doc. 59, p. 18), the loss in this case is, by any reasonable definition, a substantial loss. See Securities and Exchange Commission v.

Aleksey, 2007 WL 1789113 (M.D. Fla. 2007)($82,960.18 was a substantial loss).

      Since the maximum civil penalties are stated in the third tier, the penalty for Aerokinetic is capped at $650,000. Arguably, the maximum penalty for Bridwell is in the neighborhood of $555,000 since the statutes provide with respect to a natural person for a penalty not to exceed the greater of $130,000, or the gross amount of pecuniary gain to "such" defendant. However, the SEC made no attempt to distinguish the gain to Bridwell from the gain to Aerokinetic. Regardless, this does not present an issue since the SEC is claiming a penalty against Bridwell in the amount of $130,000.

      The problem on this issue is that neither side has articulated any cogent basis for determining the amount of the penalties. The SEC has not explained why $500,000 is an appropriate penalty for Aerokinetic, and $130,000 is an appropriate penalty for Bridwell. Moreover, they have not set forth any criteria for determining the amount. In essence, all that it says is that the defendants committed fraud. However, that is true of all defendants to whom the second and third tiers apply. If Congress had wanted defendants falling in those two tiers to have the maximum, or close to the maximum,

penalties applied, they would have said so.  Therefore, just because the defendants committed fraud does not mean that their penalties should be at the top, or near the top, of the penalty range.  Instead, a more thoughtful, considered approach is warranted.

The defendants, for their part, also do not offer reasoned guidelines for determining the amount of penalties.  The most they argue is that operating expenses should be considered because that is part of "gross pecuniary gain" (Doc. 59, p. 19).  That argument is meritless, not only because a deduction of operating expenses has previously been rejected, but also because the penalties are not sought based upon gross pecuniary gain but upon the statutory limits.  Accordingly, the defendants have provided no reason for denying civil penalties, or even for not applying the third-tier penalties.

However, the SEC's request of a penalty for $500,000 against Aerokinetic does not appear to be justified.  To start with, the fraud involved in this case does not strike me as being on the egregious end of the spectrum of fraudulent conduct.

Moreover, although the complaint alleges that the defendants had two promoters and a website, there is no indication that this scheme involved a massive public solicitation. The complaint alleges that the defendants raised more than $535,000 from at least twenty-four investors. The Torres declaration identifies just eighteen people who invested $555,000. Relatively speaking, this was not fraud on a grand scale.

Furthermore, eight of those eighteen have filed declarations asking that penalties not be imposed. Although those declarations have been discounted, they should not be totally ignored.

In addition, consideration should be given to the defendants' agreement to consent judgments. They could have made this lawsuit protracted and more expensive. As in criminal cases, their acceptance of responsibility should be given favorable consideration.

Also, from all that appears, the company ceased its fraudulent conduct after the SEC called them to account. The SEC has given no indication of any recurrence of illegal behavior.

Under these circumstances, it seems to me that Aerokinetic's conduct falls in the mid-range of third-tier penalties. Accordingly, while

recognizing that the SEC has requested penalties below the maximum amount, I would reduce the penalty requested by the SEC by fifty percent, particularly since the penalty is in addition to the amount of disgorgement and prejudgment interest. I therefore recommend a civil penalty against Aerokinetic in the amount of $250,000.

On the other hand, I recommend that the SEC's request for a civil penalty against Bridwell in the amount of $130,000 be granted. The complaint alleges that he was the driving force behind the fraudulent scheme. It alleges he made many, if not most, of the misrepresentations.

And importantly, the complaint alleges that Bridwell misused and misappropriated investor funds. Thus, it alleges (Doc. 1, ¶ 48):

> For example, Bridwell repeatedly withdrew cash directly from the Company's bank account to cover personal expenses, ranging from car payments and insurance to personal meals at restaurants. He also used money from the Aerokinetic bank account to purchase a new car for his daughter. As of the end of April 2008, there was less than $30,000 in the Company's account. Although Bridwell asserts some of the money spent was used for the operations and research and development, some $230,000 of investor funds is entirely unaccounted for.

Bridwell's defalcation is misconduct that is distinct from the execution of a fraudulent scheme.  Consequently, his misbehavior is aggravated. The goals of punishment and deterrence therefore warrant a penalty of $130,000, which is still little more than half of the penalty imposed upon Aerokinetic.

IV.

For the reasons stated above, I recommend:

1.  That defendants Aerokinetic and Bridwell be ordered to pay disgorgement of ill-gotten proceeds, jointly and severally, in the amount of $555,000.

2.  That defendants Aerokinetic and Bridwell be ordered to pay, jointly and severally, prejudgment interest in an amount as determined by the court upon a subsequent submission.

3.  That defendant Aerokinetic be ordered to pay a civil penalty of $250,000.

4.  That defendant Bridwell be ordered to pay a civil penalty of $130,000.

Respectfully submitted,

THOMAS  G.  WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: SEPTEMBER 10, 2010

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. 636(b)(1).